IDEAL MUTUAL INSURANCE COMPA-NY and Global Aviation, Plaintiffs,

v.

LIMERICK AVIATION COMPANY, Uwe Buehl, General Electric Credit Corporation of Tennessee, Defendants.

Civ. A. No. 78-2874.

United States District Court, E.D. Pennsylvania.

Oct. 22, 1982.

Richard F. Stevens, Allentown, Pa., for plaintiffs.

T.A. Frey, J.D. Faucher, Philadelphia, Pa., for General Elec. Credit Corp. of Tennessee.

Albert C. Oehrle, Norristown, Pa., for Limerick Aviation Co. and Uwe Buehl.

## FINDINGS OF FACT

TROUTMAN, District Judge.

### I. JURISDICTION

1. This is a declaratory judgment action brought to determine whether a certain policy of insurance on an airplane is applicable to an accident which occurred on June 22, 1978.

2. The Plaintiff, Ideal Mutual Insurance Company, hereinafter "Ideal" is a New York Corporation.

3. The other Plaintiff, Global Aviation, hereinafter "Global", is a Louisiana Insurance Company.

4. The Defendant, Limerick Aviation Company, hereinafter "Limerick," is a Pennsylvania company.

5. Uwe Buehl, a principal in Limerick was at the time of suit a resident of Pennsylvania.

6. General Electric Credit Corporation, hereinafter "G.E.", is a Tennessee corporation.

7. If the Insurance Policy was valid, the sums payable would exceed $10,000.

8. Thus this Court has jurisdiction.

### II. THE PARTIES

9. Plaintiff "Ideal" is a corporation which writes insurance policies on airplanes and which issued the subject policy in this case.

10. Plaintiff "Global" is an insurance broker that received the application for insurance from Limerick Aviation and made the underwriting decisions as to issuance, and set forth the conditions governing the policy. Global then had the policy written through Ideal.

11. "Limerick" was a company that was involved in the sale and use of airplanes. It was the named insured under the Ideal policy and the owner of the plane that was insured.

12. "Uwe Buehl" was the principal owner of "Limerick" and the person who took out the application for insurance on behalf of Limerick. He was authorized to act on behalf of Limerick.

13. "G.E." was a mortgagee of the airplane. As the case developed, the interest of "G.E." was taken over by Global and G.E. took no active part in the trial.

14. "Joseph Colantonio" is not a party, but as the deceased pilot of the airplane on the date of the crash, he needs to be mentioned because the insurance policy sets cer-

tain minimum standards for pilots and he does not meet those standards. (See Findings of Fact 29 to 37).

## III. THE UNDERLYING FACTS

15. "Limerick" was the owner of a Cessna 402 multi-engine airplane.

16. Uwe Buehl had made application on behalf of Limerick for a policy of airplane insurance.

17. Global Aviation in reliance of the application wrote a standard aircraft policy through Ideal Mutual on June 7, 1978.

18. The application, the declaration and exclusions and a sample policy are Plaintiff's Exhibits 1, 2, and 3.

19. They fairly and accurately represent the documents applicable to this case.

20. On June 22, 1978 the said airplane crashed killing the pilot, Joseph Colantonio and four passengers.

21. The policy, if in force, would have insured the pilot and the passengers for up to $100,000 per seat.

22. If the policy were in force the insurance carrier would have the duty of investigating the accident, defending any claims, and paying any verdicts.

23. The insurance company, after an investigation, determined that facts existed to deny coverage.

24. Since the insurance carrier is contesting both the issuance of the policy and whether the exclusions apply and since Limerick will be affected by a decision as to whether a valid enforceable policy exists, an actual controversy exists between the parties.

## IV. ISSUES

25. Plaintiff has set forth five counts for relief. Basically, they can be divided into two legal theories.

A. If the policy were valid, Plaintiff maintains that certain exclusions from coverage set forth in the policy makes the insurance policy inapplicable to this accident.

B. The other issue is the allegation of fraud in the application in areas material to the risk which allegedly make the contract void ab initio.

26. For the purpose of these findings of fact, we will be dividing the issues into two categories labeled "The Exclusion Issues" and "The Fraud Issue".

27. While the Plaintiffs presented testimony concerning two other issues, which we will label the "Ownership Issue" and the "Airworthiness Issue", because the findings of fact and conclusions of law support Plaintiff's view that the policy doesn't apply, we see no necessity to overburden the record by making unnecessary findings and conclusions on these issues and therefore make no findings on these issues.

## V. THE EXCLUSION ISSUES

A. The Pilot Exclusion.

28. The Exclusions in question are found in Plaintiff's Exhibit Nos. 2 and 3.

29. The first applicable exclusion is stated as follows:

"This policy does not apply:

2. To any occurrence or to any loss or damage occurring while the aircraft is operated in flight by other than the pilot or pilots set forth under Item 7 of the Declaration."

30. Item 7 of the declaration sets forth 2 classes of pilots. One, named pilots and two, unnamed pilots who had met certain minimum criterions.

31. The only named pilot under the declarations was Uwe Buehl. He was not flying the airplane on the day in question and thus we must move to the second category to see if the policy applied.

32. The policy did permit nonnamed pilots to fly the aircraft if they met certain requirements.

33. Joseph Colantonio is in this second category and thus, the question is, what were the requirements and how did Joseph Colantonio measure up?

34. The requirements were three in number:

(1) 1,000 total logged hours; and

(2) 250 of those hours in a multi engine aircraft; and

(3) 25 in the same make and model of aircraft as the one intended to be flown.

35. The insured aircraft here was a twin engine Cessna Model 402.

■ 36. The pilot of the aircraft, Joseph Colantonio did not meet any of the above 3 standards. Instead as the following reveals he was substantially below all three requirements:

| Required | Colantonio |
|---|---|
| 1,000 hours logged | 280.7 hours |
| 250 hours multi-engine | 69.9 hours |
| 25 hours make and model, i.e., Cessna 402 | 22.0 hours |

37. Since Colantonio did not have the requisite hours to meet the minimum standards for coverage under this we find as a fact that the exclusion clause of the policy is applicable.

B. *The Purpose Exclusion*

38. Another exclusion, Item 4(c) of the policy stated: "This policy does not apply to any insured . . . (c) who operates or permits the aircraft to be operated for . . . any purpose other than as specified in the declarations."

39. The purpose as specified in the declarations was that the plane was to be used for the business or pleasure of "Limerick". As Buehl stated "It was used for my business . . . The automobile business and airplane use business. I used it as a personal aircraft, to get around."

40. The use at the time of the accident had nothing to do with either the business or pleasure of "Limerick" as admitted by Buehl himself:

Q. It was not being used for any of these purposes on this occasion?

A. "No, No."

Q. Heinly—This occasion being the accident?

A. Stevens—The accident?

A. The accident.

41. On the contrary it was being used by Colantonio to transport business associates of Colantonio to a trade show in Chicago.

■ 42. In effect, the airplane was being used by Colantonio for his own purposes and it was, in effect, being used in the air charter business.

43. Such use is not a permitted use under the declarations and, thus, we find as a fact that the exclusion applies.

VI. THE FRAUD ISSUE

44. The fraud issue arises as a result of the application taken out by Uwe Buehl on behalf of "Limerick".

45. Uwe Buehl was the agent and employee of Limerick at the time of the application and was authorized to make the application on Limerick's behalf.

46. The application, P–1, was both a printed form and contained certain handwritten answers. The handwritten answers were in Uwe Buehl's handwriting.

47. P–1 contains the following language: "All particulars herein are true and complete to the best of my/our knowledge and no information has been withheld or suppressed and I/we agree that this Application and the terms and conditions of the policy in use by the Insurer shall be the basis of any contract between me/us and the Insurer."

■ 48. The application contains three answers that are either not true or are not complete and thus information has been withheld or suppressed.

49. The first question was whether any named pilot in the application had ever had an aircraft accident.

50. There was only one named pilot in the application and that was Uwe Buehl. The answer given by Uwe Buehl was "No".

51. To the contrary, however, Uwe Buehl had had an airplane accident while a pilot and thus this answer was false.

52. The second question was whether any aircraft in the custody of the insured had ever been damaged and there was no answer given despite the requirement on

the application to list all such damages. This answer, therefore, was not complete and as a result, the fact of such damage was suppressed or withheld in violation of the affidavit.

53. The true facts were that there had been two aircrafts damaged.

54. The third incorrect answer was the denial that any insurance company had ever declined an application or refused to renew, or cancelled a policy.

55. In fact there were 5 previous cancellations and 6 refusals.

56. There is much more involved in flying an airplane than is involved with a car and it is very important for an insurer to know the safety record of the pilots who are intended to fly the plane.

57. Similarly, when there has been a history of cancellation or refusal of insurance, a red flag comes up and the insurance carrier takes a much harder look at the insured. Because the answers to these questions hid the cancellation, etc., the insurance company did not have a fair opportunity to evaluate the risks. We find as a fact that had the true facts been known, no policy of insurance would have been written.

58. These questions were material to the risk and a timely answer based upon the known facts, would have led to a refusal to write the insurance.

*Conclusions of Law—Jurisdiction*

1. Diversity of citizenship exists as between the parties and the amount in controversy exceeds $10,000, the jurisdiction of this Court is therefore established under 28 U.S. Code 2201.

2. The extent of an insurers liability concerning insurance coverage may properly be resolved in a declaratory judgment action. *Spivey Company v. Travellers Insurance Companies,* 407 F.Supp. 916 (E.D. Pa.1976) and *Bird v. Central Company,* 351 F.Supp. 700 (E.D.Pa.1972).

3. While the boundaries of what is meant by the words "an actual controversy" have no definable limits, *Bird v. Central,* *supra,* clearly holds where an insurer is denying coverage to its insured with substantial financial exposure involved "an actual controversy exists".

4. The exclusion section dealing with covered pilots is unambiguous. It sets forth 2 classes of persons who may pilot the airplane. Uwe Buehl, and all other pilots who meet certain minimum qualifications which are clearly set forth. Joseph Colantonio was the admitted pilot of the aircraft. He did not, however, meet the requirements to be a covered pilot. This is not a case where there was a minimal variance between the pilot requirements and actuality, but a case involving a substantial deviation in all three of the necessary categories. Since even one violation would bring the exclusion into play, we conclude that the exclusion clause is applicable and the Plaintiffs have no duties to the insured under this policy. *Bequette v. National Insurance Underwriters, Inc.,* 429 F.2d 896 (1970—9th Cir.); *Ideal Mut. Ins. Co. v. C.D.I. Const. Inc.,* 640 F.2d 654 (1981—5th Cir.).

5. The purpose exclusion is also unambiguous. The airplane was to be used only for the purposes of "Limerick's" business. It was not to be used as a sort of "Hertz Rent an Airplane." While Buehl could have used it for his own purposes, business or pleasure, such a purpose cannot be expanded to include loaning the airplane to the world at large. Thus for this additional reason, the policy is not applicable to this accident.

6. The application is clearly false. Buehl denied any accident, damage to airplanes and prior cancellations or denials of coverage. These items are material to the risk and the policy would not have been written if the true facts were known. Thus because of the initial fraud this policy of insurance is not applicable.

7. As a result of any of the above, it is clear that Ideal and Global have no responsibility under the terms of the insurance policy. Accordingly, judgment will be entered for the plaintiffs.